Andrea R. Meyer
**SUSSMAN SHANK LLP**
1000 SW Broadway, Ste 1400
Portland, OR 97205
P: (503) 227-1111
F: (503) 248-0130
ameyer@sussmanshank.com

Sartouk H. Moussavi
(*pro hac vice*)
**THOMPSON COBURN LLP**
55 East Monroe Street, 37th Floor
Chicago, IL 60603
P: (312) 346-7500
F: (312) 580-2201
smoussavi@thompsoncoburn.com

Zachary G. Newman
(*pro hac vice*)
**THOMPSON COBURN LLP**
488 Madison Avenue
New York, NY 10022
P: (212) 474-7200
F: (212) 478-7400
znewman@thompsoncoburn.com

*Attorneys For Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **COLUMBIA SPORTSWEAR COMPANY**, an Oregon corporation, **COLUMBIA SPORTSWEAR NORTH AMERICA, INC.**, an Oregon corporation, and **COLUMBIA BRANDS USA, LLC**, an Oregon limited liability company,<br><br>      Plaintiffs,<br><br>v.<br><br>**THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK**, a non-profit educational corporation formed by special act of the Legislature of the State of New York,<br><br>      Defendant. | Case No. 3:25-cv-01299-AB<br><br><br>DEFENDANT COLUMBIA UNIVERSITY'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) OR TRANSFER UNDER 28 U.S.C. § 1404(a)<br><br>JURY TRIAL DEMANDED<br><br>REQUEST FOR ORAL ARGUMENT |

  DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

I.     The Consent Letters Plaintiffs Rely On To Attempt To Establish Jurisdiction ...................... 3

   A.   The Four Letters of Consent Concern Foreign Trademark Matters .................................. 3

   B.   The 2023 Agreement Does Not Establish Jurisdiction Over Columbia University ........... 5

II.    Plaintiffs Fail To Establish Purposeful Availment ................................................................ 7

   A.   Plaintiffs fail to establish that the University has "continuing obligations" to Plaintiffs or Oregon ............................................................................................................................ 8

        1.   Plaintiffs misapply Burger King. ........................................................................... 8

        2.   The consent letters do not create "continuing obligations" sufficient for jurisdiction.  10

   B.   The Consent Letters' Center of Gravity Lies Outside Oregon ........................................ 11

        1.   The consent letters predominantly concern foreign trademark use/registration and are unrelated to Oregon ............................................................................................. 13

   C.   Plaintiffs' Case Law is Inapposite and Does Not Support Jurisdiction ........................... 14

   D.   Plaintiffs' "Course of Dealing" Argument Improperly Substitutes Plaintiff-Side Contacts for Defendant-Side Conduct ......................................................................................... 18

III.   Plaintiffs Fail To Establish Purposeful Direction ............................................................... 20

   A.   Plaintiffs' Response Misstates Columbia University's Arguments. ................................. 20

   B.   *Herbal Brands* focuses on whether sales into a forum made in the ordinary course of business or are random, isolated, or fortuitous. ...................................................... 22

   C.   Plaintiffs' Cannot Establish Any Sales Into Oregon Occurred As Part Of Columbia University's Ordinary Course of Business ................................................................... 23

   D.   Alumni Presence and Website Accessibility Do Not Establish Express Aiming ............. 26

   E.   Plaintiffs Cannot Manufacture Jurisdiction Through Post-Dispute Purchases ................ 27

   F.   Conclusion Regarding Purposeful Direction ................................................................... 29

IV.   Plaintiffs Fail To Show That Their Claims "Arise Out Of Or Relate To" Any Oregon-Directed Conduct ............................................................................................................... 29

V.     If The Court Declines To Dismiss, Transfer To New York Is Warranted ........................... 31

VI.   Conclusion ......................................................................................................................... 33

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Eagle Outfitters, Inc. v. Lyle & Scott Ltd.*,
No. 2:20-CV-1488-RJC, 2021 WL 4287997 (W.D. Pa. Sept. 21, 2021) ...............................16

*Arc Wood & Timbers, LLC v. Riverwood Flooring & Paneling, Inc.*,
No. 21-CV-04885-HSG, 2021 WL 5771136 (N.D. Cal. Dec. 6, 2021) ...........................12, 14

*Arce v. Ozone Cmty. Corp.*,
No. 1:21-CV-00489-BLW, 2022 WL 4585825 (D. Idaho Sept. 29, 2022) .......................12, 13

*Boschetto v. Hansing*,
539 F.3d 1011 (9th Cir. 2008) ...............................................................................................11, 28

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).............................................................................................8, 9, 13, 14

*Cardinale v. Thueringer*,
No. CV-22-01743-PHX-DJH, 2023 WL 5133624 (D. Ariz. Aug. 10, 2023).........................12

*Chloe v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010)...................................................................................................28

*Davis v. Cranfield*,
71 F.4th 1154 (9th Cir. 2023) .....................................................................................19, 20, 29

*Domaine Carneros, Ltd. v. Lea Trading LLC*,
No. 24-CV-01834-BLF, 2024 WL 4197633 (N.D. Cal. Sept. 12, 2024) ...............................27

*E*Healthline.com, Inc. v. Pharmaniaga Berhad*,
No. 20-17182, 2022 WL 1744060 (9th Cir. May 31, 2022).............................................12, 13

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021).................................................................................................................29

*Global Commodities Trading Group, Inc. v. Beneficio de Arroz Choloma, S.A.*,
972 F.3d 1101 (9th Cir. 2020) .................................................................................................18

*Herbal Brands, Inc. v. Photoplaza, Inc.*,
72 F.4th 1085 (9th Cir. 2023) ...........................................................................21, 22, 24, 27

*In Re Kia Hyundai Vehicle Theft*,
No. 8:22-ML-03052-JVS, 2024 WL 3469044 (C.D. Cal. July 5, 2024) ................................26

*Mazal Grp. LLC v. Yousef*,
No. 2:23-CV-03278-FWS-AGR, 2023 WL 8896263 (C.D. Cal. Nov. 8, 2023) .....................27

*Mojis, Inc. v. Sazerac Brands, LLC*,
No. 20-CV-00777-KLM, 2021 WL 12298483 (D. Colo. Mar. 31, 2021) ...............................17

*Moretti v. Hertz Corp.*,
No. C 13-02972 JSW, 2014 WL 1410432 (N.D. Cal. Apr. 11, 2014)....................................32

*NBA Props., Inc. v. HANWJH*,
46 F.4th 614 (7th Cir. 2022) ...................................................................................................28

DEFENDANT'S MOTION TO DISMISS (OR TRANSFER)

*Prolacta Bioscience, Inc. v. Prolact Ltd.*,
No. 2:24-CV-10392-WLH (E), 2025 WL 2078270 (C.D. Cal. June 18, 2025) ..........24, 27, 28

*RecogniCorp, LLC v. Nintendo Co.*,
No. 3:11-CV-01532-ST, 2012 WL 4739538 (D. Or. Oct. 3, 2012)........................................33

*Santa Barbara Polo Club, Inc. v. Lifestyle Licensing B.V.*,
No. 2:21-CV-07989-CAS (AFMX), 2024 WL 3891798, at *5 (C.D. Cal. Aug.
19, 2024) ................................................................................................................................15

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) ................................................................................................29

*Silk v. Bond*,
65 F.4th 445 (9th Cir. 2023) ..................................................................................................30

*Smith v. Bellco Credit Union*,
No. 2:20-CV-09772-MCS-JPR, 2020 WL 8611063 (C.D. Cal. Dec. 14, 2020) ....................12

*Stomp, Inc. v. NeatO, LLC*,
61 F.Supp.2d 1074 (C.D.Cal.1999), I......................................................................................28

*Tr. of Summers Fam. Tr. TA Neak Prods. Buff WA Pty, Ltd. v. Nat'l Distribution
Warehouse, Inc.*,
No. 2:20-CV-10741-CAS-EX, 2021 WL 2354507 (C.D. Cal. June 7, 2021) .........................24

*Vicious Brands, Inc. v. Face Co., LLC*,
No. 24-CV-04996-LJC, 2024 WL 4753287, at *11 (N.D. Cal. Nov. 12, 2024) .....................28

*Walden v. Fiore*,
571 U.S. 277 (2014).......................................................................................11, 13, 19, 31

*Wheel Pros, LLC v. Performance Tire*,
No. CV170042PSGAJWX, 2017 WL 6017292 (C.D. Cal. Apr. 24, 2017) ...........................32

**Statutes**

28 U.S.C. § 1404(a) ...............................................................................................................31

DEFENDANT'S MOTION TO DISMISS (OR TRANSFER)

Plaintiffs have not established personal jurisdiction over Columbia University in Oregon because Columbia University simply lacks the requisite minimum contacts. Unable to point to contacts between Columbia University and Oregon, Plaintiffs instead argue for jurisdiction based on purported contacts between Columbia University and Plaintiffs, alleging that four consent letters involving foreign trademark rights create a "20-year course of dealing" with "continuing obligations" that subject Columbia University to personal jurisdiction in Oregon. Plaintiffs' Response, however, is conspicuously void of any analysis of the substance of the four consent letters, including the one that forms the basis for its claims (the 2023 Letter Agreement). But this is not an accidental oversight.

Any analysis of the four consent letters under *Burger King* and other controlling law reveals that the consent letters do not impose continuing obligations on Columbia University, let alone Oregon-centered obligations. In fact, none of the consent letters contain any provisions requiring Columbia University to participate in any Oregon-based activities. They do not require Columbia University to make payments to or in Oregon, submit reports to or in Oregon, participate in audits or inspections in Oregon, attend meetings in Oregon, litigate/arbitrate disputes in Oregon, regulate Oregon-specific conduct, govern trademark use under Oregon law, restrict or authorize sales directed at Oregon, create obligations to monitor, report, or enforce rights in Oregon or with respect to Oregon citizens or consumers. The absence of forum-centered obligations confirms that Columbia University did not affiliate itself with Oregon such that it would make jurisdiction foreseeable and thus, Plaintiffs' purposeful availment theory fails.

Plaintiffs' purposeful direction theory fares no better. Under *Herbal Brands*, purposeful direction is proper only where sales into the forum occur as part of the defendant's regular course of business as opposed to being random, isolated, or fortuitous. Columbia University has

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

explained, with evidentiary support, why sales of the Accused Products into Oregon were likely zero, and, in any event, why, if any minimal sales to Oregon consumers did exist, they were random, isolated, or fortuitous and thus not part of Columbia University's regular course of business.

Plaintiffs' unsupported suggestion that the mere existence of a small contingent of Columbia University alumni in Oregon, by itself, somehow confers jurisdiction should not compel this action to continue here. Columbia University provided a declaration to rebut Plaintiffs' threadbare allegations as to alumni, potential students, their parents, and "well-wishers," have identified no sales to Oregon consumers, and have made no efforts to sell the Accused Products within the State's boundaries. Plaintiffs clearly realize this, as they purchased apparel after learning Columbia University was challenging jurisdiction to try to manufacture a jurisdictional foundation but counsel's purchase of a few of the Accused Products in this circumstance cannot be used to establish personal jurisdiction.

Plaintiffs' argument that the presence of alumni in the forum state, the ability to purchase university apparel on a university's website, or the communications with potential students in forum states establishes jurisdiction would unfairly subject universities, nonprofits, and membership organizations to nationwide jurisdiction wherever their alumni, members, or potential new members happen to live, which would be inconsistent with due process under the Constitution and prevailing federal caselaw.

For the reasons set forth herein and in Columbia University's opening brief, the Court is respectfully requested to dismiss this case with prejudice or, in the alternative, to transfer the case to the United States District Court for the Southern District of New York.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

**I.    The Consent Letters Plaintiffs Rely On To Attempt To Establish Jurisdiction.**

**A.    The Four Letters of Consent Concern Foreign Trademark Matters**

Plaintiffs' argument for jurisdiction is largely based on four short "letters of consent" (*a/k/a* "consent letters" or "consent agreements") that Columbia University presented in its motion to dismiss, with Plaintiffs contending they demonstrate a consistent "string of *co-existence agreements* . . . ." ECF No. 29 at 12 (emphasis added).[1] Plaintiffs rely on these consent letters to suggest to the Court that Columbia University established a "20-year course of dealing" with purported "continuing obligations" with Oregon to establish purposeful availment.

But, as shown below, the consent letters merely consist of Plaintiffs providing consent for the University's use/registration of "Columbia" marks in foreign countries and thus they are insufficient to constitute purposeful availment.

The initial consent letters concerned trademark rights only in *foreign countries*: one in 2006 (Korea), one in 2015 (China) and one in 2020 (Brazil).[2] The 2006 Korea consent, a letter from Columbia Sportswear Company to Columbia University, expressly explained that the letter's purpose was Plaintiffs' consenting to use/registration of "Columbia" in Korea (ECF No. 25-1, Ex. B, emphasis added):

> This letter is specifically to set forth the terms under which the University, and those authorized by it, may use and register use of the term COLUMBIA on and in connection with the Articles in Korea without objection by Sportswear.

---

[1] Page citations to briefs and other materials previously filed with the Court are to the pagination reflected in the blue ECF header, not to any internal footer pagination.

[2] The only consent letter that involves domestic issues is the 2023 consent, which listed a host of foreign countries, and also included the United States. The 2023 consent (referred to as the "2023 Letter Agreement" in the University's opening brief) was for a host of foreign countries but mistakenly included "the United States"—a jurisdiction in which Columbia University holds senior trademark rights. Columbia University intends to address this mistaken inclusion should this case proceed. Regardless of the mistaken inclusion, Columbia University has senior common law trademark rights that are not impacted or diminished by the 2023 consent.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Similarly, the 2015 China consent, again a letter from Plaintiffs to the University, also explained that it concerned use/registration of "Columbia" in China (*id*., emphasis added):

> This letter is specifically to set forth the terms under which the University, and those authorized by it, may use and register the term COLUMBIA on and in connection with the manufacture or sale of the Articles in China without objection by Columbia Sportswear.

Likewise, the 2020 Brazil consent, as the document heading indicates, was merely a "letter of consent" provided by Columbia Sportswear Company to Columbia University consenting to use and registration of Columbia University's mark in Brazil. Notably, the 2020 Brazil consent did not include any limitations or conditions on use of the mark, and, like the 2006 Korea consent, was signed only by Plaintiffs' representative (in this case, Adam Kelly, Plaintiffs' in-house counsel and declarant, *see* ECF No. 30) and two witnesses of Plaintiffs—it was not signed by any representative of Columbia University. The 2020 Brazil consent is reproduced below in its entirety (see also, ECF No. 25-3):

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

In fact, of the four consent letters, only two were executed by Columbia University. Both the 2006 Korea consent and the 2020 Brazil consent were signed only by Plaintiffs. *See* ECF No. 25-1, Ex. B; ECF No. 25-3.

**B.     The 2023 Agreement Does Not Establish Jurisdiction Over Columbia University**

The question of whether jurisdiction exists centers on the terms of the 2023 Agreement, which was the same format as the 2015 China consent letter except that it related to a host of countries:

> This letter is specifically to set forth the terms under which the University, and those authorized by it, may use and register use of the term COLUMBIA on and in connection with the manufacture or sale of the Articles in the Territories without objection by Columbia Sportswear.

ECF No. 25-1, Ex. A (emphasis added). Plaintiffs were aware that Columbia University was using its own name, "Columbia," on apparel long before the Columbia Hat Company was founded, let alone when Columbia Sportswear Company filed its trademark application around five decades later. Indeed, Columbia University is the senior user of "Columbia" on apparel in the United States—a fact that will be established should the case proceed. That is presumably why, when Plaintiffs provided consent for Korea in 2006, China in 2015, and Brazil in 2020, Plaintiffs did not insist that Columbia University be limited in the way it could use "Columbia" in the United States.

While the issue of whether the parties intended to include the United States in the 2023 Letter Agreement is not presently before the Court, resolution of the issue does not affect the conclusion that the 2023 Letter Agreement—or any other consent agreement—does not constitute purposeful availment. But the circumstances of how the inclusion of the United States in the consent letter came to be reveals Plaintiffs are exaggerating the events leading up to the 2023 Letter Agreement to justify its filing in Oregon. Plaintiffs claim that the 2023 Letter Agreement was the result of negotiations between the parties, with Plaintiffs' so-called "understanding" that

5
DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

the University wanted to "formalize the parties' co-existence understanding essentially worldwide."[3] ECF No. 29 at 14. But this claim is not supported, as there appears to be only three emails (identified below) that led to the 2023 Letter Agreement, and *zero* negotiations.

- A June 8, 2023 email in which Columbia University's counsel sent an email with a draft consent letter (which contained numerous errors, one of which Mr. Kelly caught and addressed) (*see* ECF No. 30-4 at 2);
- A June 14, 2023 response email from Mr. Kelly that attached its executed copy of the consent (*id.* at 1-2); and
- A June 15, 2023 response to that email from the University's counsel that attached the counter-signed agreement (*id.* at 1).

That is it. There was not one mention about including the United States in these emails apart from the errant inclusion in the attachment itself.

The subject line of the June 8 email from Columbia University's outside counsel was *Columbia University – Request for Consent – **India, Turkey,** etc.* ECF No. 30-4 at 2. The June 8 email noted that "we last spoke pre-pandemic" and that "Columbia University is expanding its licensing programs **abroad**," and counsel asked that Plaintiffs "execute the attached express consent for Columbia University to use and register its COLUMBIA formative marks in the jurisdictions referenced therein," noting that the "consent is nearly identical to one the parties' executed in 2015 for China." *Id.*[4] In other words, though Columbia University has (and had) been using "Columbia," including on apparel, for far longer than Plaintiffs have existed, and has never agreed (and would not agree) to restrictions on how it could use its name in the United States, Plaintiffs would have the Court believe that Columbia University intended, of its own volition, to

---

[3] The idea that the 2023 Letter Agreement—a scant two-page letter, completely devoid of all basic contract terms found in a typical coexistence agreement—was intended to formalize a "worldwide existence agreement" is belied by the lack of content in the document itself.

[4] The June 8, 2023 email from counsel to Mr. Kelly is a reply to a January 6, 2020 email between them, with the subject line *RE: Columbia University - Request for Consent - Brazil Trademark No. 840397178*. *Id.* at 2-3.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

restrict the use of its own name in the United States, even though Plaintiffs had not asked for any such restriction (or anything at all). That is demonstrably not the case and, if this case should proceed, Columbia University will establish that the inclusion of the "United States" was an unintentional mistake; one in which, in any event, carries no legal weight in view of the University's senior trademark rights in "Columbia." Nevertheless, regardless of whether the 2023 Letter Agreement was meant to include the United States, the consent letter does not constitute a basis for personal jurisdiction. Nor does it reflect Columbia University's consent to Oregon jurisdiction or affect Columbia University's senior trademark rights.

## II.    <u>Plaintiffs Fail To Establish Purposeful Availment</u>

Plaintiffs' purposeful availment theory rests on the four letters of consent, which Plaintiffs misleadingly characterize as a "20-year course of dealing" resulting from Columbia University's "repeated, express solicitation of continuing obligations between itself and Columbia Sportswear." *See, e.g.*, ECF No. 29 at 19. But Plaintiffs' theory rests on a fundamental misunderstanding of what purposeful availment requires under Supreme Court and Ninth Circuit precedent and therefore fails as a matter of law. First, as noted, the consent letters fail to establish continuing obligations between the parties. Second, regardless of whether the consent letters create continuing obligations (they do not) and regardless of who supposedly "solicited" them, jurisdiction would nevertheless be improper in Oregon because the "center of gravity" of the consent letters lies elsewhere. Third, Plaintiffs' cited caselaw, which involved robust trademark coexistence agreements with extensive continuing obligations, are materially different from the basic consent agreements at issue here and are therefore distinguishable.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

### A.    Plaintiffs fail to establish that the University has "continuing obligations" to Plaintiffs or Oregon

Plaintiffs' purposeful availment theory hinges on its assertion that the consent letters create "continuing obligations" that, by themselves constitute "conduct [that] is the very definition of 'purposeful availment.'" ECF No. 29 at 8. The consent letters themselves, however, belie this theory. As set forth more fully above, the consent letters merely explained the conditions for Columbia Sportswear's consent to the University's use/registration of the "Columbia" mark in Korea, China, or the various territories identified in the 2023 Letter Agreement (the 2020 Brazil consent had no conditions on Plaintiffs' consent at all). *See* section I(A), *supra*. While Plaintiffs argue these consents are "repeated, express solicitation[s] of continuing obligations" that "fall[] directly within the holdings of *Burger King* and other controlling authority," ECF No. 29 at 19, a review of *Burger King* and the authority cited reveal Plaintiffs' argument to be specious.

#### 1.    Plaintiffs misapply Burger King.

Plaintiffs heavily rely on *Burger King* but misapply it. *Burger King* held that a contract with an out of state party *can* establish sufficient minimum contacts in the other party's home forum where it is demonstrated that the out of state party has a "substantial and continuing relationship" with the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 487 (1985). It did not, however, hold that an individual's contract with an out of state party necessarily means sufficient minimum contacts. *Id.* at 478. It is well-established that the jurisdictional analysis set forth in *Burger King* and its progeny is case-specific and turns on the forum contacts, including any continuing contacts involved in the contract.

In *Burger King*, the Supreme Court stated the franchise contract at issue "had a *substantial* connection with [the] State," because the defendant entered into a franchise agreement that (a) was governed by Florida Law, (b) emphasized that Burger King's operations are conducted and

8
DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

supervised from its Florida headquarters, (c) required all relevant notices and payments be sent to Florida, (d) was made and enforced in Florida, (e) required extensive, ongoing performance tied to Florida, (f) involved continuous communications with Florida, and (g) was part of a franchise system deliberately structured to exploit Florida-based IP and oversight. *Id.* at 479-82. (emphasis in original). The Supreme Court emphasized that these forum-centered features—not the mere existence of a contract with an entity residing in the forum—established purposeful availment. *Id.*

The facts here are fundamentally different. Columbia University's contacts with Oregon, even viewing the four consent letters in the light most favorable to Plaintiffs, are practically nonexistent. Under *Burger King*, the jurisdictional significance of "continuing obligations" depends on whether the defendant deliberately created obligations that are performed in, governed by, or otherwise centered on the forum state, such that the defendant can fairly be said to have invoked the forum's legal protections. *Id. Burger King* thus cuts *against* Plaintiffs' argument.[5] Plaintiffs have not (and cannot) establish purposeful availment because none of the consent agreements, including the 2023 Letter Agreement, create any continuing obligations having anything to do with Oregon whatsoever. The consent letters simply memorialize Plaintiffs' decision not to oppose trademark activity in Korea, China, Brazil, or the Territories in the 2023 Letter Agreement provided Columbia University complies therewith. Hardly "continuing obligations" as contemplated by *Burger King* and other controlling law. Here, other than sweeping and exaggerated generalizations of the Parties' "relationship," Plaintiffs cannot point to any

---

[5] It is noteworthy to consider the portion of the quote omitted and replaced by ellipsis in Plaintiffs' Response (shown in ***bold***): "the defendant deliberately has ***engaged in significant activities within a State, or has*** created 'continuing obligations' between himself and residents of the forum . . . ." *See Burger King*, 471 U.S. at 475-76 (internal citation omitted).

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

specific conduct that could be considered deliberately creating obligations to be performed in, governed by, or otherwise centered on Oregon.

### 2. The consent letters do not create "continuing obligations" sufficient for jurisdiction.

As noted above, the consent letters merely state Plaintiffs' assent to the University's use and registration of the University's trademarks in various jurisdictions with certain use/registration conditions in those jurisdictions.[6] Unlike the franchise agreement at issue in *Burger King* and its continuing obligations in Florida, the consent letters do not create "continuing obligations" in Oregon. The 2023 Letter Agreement states in relevant part: "Columbia Sportswear consents to the use and registration in the Territories [] of the term COLUMBIA [] on condition that any use and registration of COLUMBIA is only in conjunction with at least one other indicia of the University." ECF No. 25-1, Ex. A. It also states that "Columbia Sportswear covenants and agrees not to [sue]" while the University agrees to "not use or register [] in the Territories the term COLUMBIA without the University Indicia." *Id.* Thus, the "obligations" in the 2023 Letter Agreement, such that there were any, only related to the conditions on which Columbia Sportswear would consent to Columbia University's use/registration of the relevant marks in those Territories.

The 2023 Letter Agreement did not obligate Columbia University to *do* anything at all and certainly did not condition Columbia University's conduct on any Oregon-based performance. It did not require Columbia University to take any action in Oregon, to direct any performance to Oregon, to submit to Oregon law, or to engage in any ongoing course of conduct with Oregon as a forum. The same is true for the 2015 agreement concerning China. The other two consent letters concerning Korea and Brazil had even less: the 2006 Korea Consent was not signed by the

---

[6] In fact, the 2020 Brazil Consent does not contain any use or registration conditions on Plaintiffs' consent for the University to use/register its mark in Brazil. *See* ECF No. 25-3.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

University and contained no agreement of any kind from the University as to the manner of use/registration, and the 2020 Brazil Consent not only was not signed by the University and contained no agreement of any kind from the University, but also did not even include any conditions on Plaintiffs' consent to the University's use/registration of the relevant trademark. In sum, the four consent letters imposed no affirmative obligations on the University and did not relate to Oregon beyond Plaintiffs being located there. Plaintiffs' characterization of these letters as "repeated, express solicitation of continuing obligations" is thus, at best, a gross exaggeration.

A defendant does not purposefully avail itself of a forum simply because it receives assurances from a forum resident that the resident will not object to trademark use/registration almost exclusively in foreign territories. If that were enough, any company that obtained foreign trademark consent from a U.S. rights holder would be subject to personal jurisdiction wherever that rights holder happened to be headquartered—an outcome flatly inconsistent with *Walden's* command that "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). In short, the consent letters demonstrate *the absence* of purposeful availment, as they confirm that the parties' interactions merely concerned trademark rights in certain territories, required no Oregon-based performance, and created no ongoing obligations centered in Oregon. Plaintiffs' attempt to shoehorn the consent letters into *Burger King*'s "continuing obligations" framework impermissibly replaces a defendant-focused jurisdictional inquiry with one based solely on Plaintiffs' residence.

## B.    The Consent Letters' Center of Gravity Lies Outside Oregon

Purposeful availment does not turn on the plaintiff's location or the defendant's awareness of where its counterparty resides. *See Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008) ("As the Supreme Court has expressly cautioned, a contract alone does not automatically establish minimum contacts in the plaintiff's home forum."). It turns on whether the defendant deliberately

11
DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

created obligations centered in the forum state or otherwise invoked the forum's benefits and protections. *See Arc Wood & Timbers, LLC v. Riverwood Flooring & Paneling, Inc.*, No. 21-CV-04885-HSG, 2021 WL 5771136, at \*3 (N.D. Cal. Dec. 6, 2021) (no jurisdiction despite a decade long relationship where relationship was not forum-centered). And because the purposeful availment analysis looks to whether a contractual relationship is centered in the forum state for purposes of the jurisdictional analysis, courts in the Ninth Circuit have held that a contract does not give rise to specific jurisdiction in the forum where the contract's center of gravity lies elsewhere. *See E\*Healthline.com, Inc. v. Pharmaniaga Berhad*, No. 20-17182, 2022 WL 1744060, at \*1 (9th Cir. May 31, 2022) (defendants' business relationship with a Delaware corporation headquartered in California did not generate sufficient minimum contacts with California because the "center of gravity" of their relationship was in Saudi Arabia); *Smith v. Bellco Credit Union*, No. 2:20-CV-09772-MCS-JPR, 2020 WL 8611063, at \*4 (C.D. Cal. Dec. 14, 2020) (center of gravity of loan agreement was in Colorado, not California); *Arce v. Ozone Cmty. Corp.*, No. 1:21-CV-00489-BLW, 2022 WL 4585825, at \*8 (D. Idaho Sept. 29, 2022) (center of gravity of agreement was in California, not Idaho); *Cardinale v. Thueringer*, No. CV-22-01743-PHX-DJH, 2023 WL 5133624, at \*4 (D. Ariz. Aug. 10, 2023) (center of gravity did not lie in Arizona where there was no formal contract with ongoing obligations to Arizona beyond limited calls and texts). Applying these cases to the facts, it is indisputable that Oregon is not the "center of gravity" for any of the consent letters.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

### 1. *The consent letters predominantly concern foreign trademark use/registration and are unrelated to Oregon.*

Plaintiffs have not shown the consent letter agreements are directed at Oregon. The letters, and communications surrounding them, show that they were predominantly of foreign effect[7] and did not relate to Oregon beyond the fact that Columbia Sportswear is headquartered in Oregon. *See* ECF No. 25-1 at Exs. A-B; ECF No. 25-3. This is precisely the type of connection that *Walden* indicates does not support jurisdiction. 571 U.S. at 285. Accordingly, the consent letters that form the basis of Plaintiffs' jurisdiction theory do not support a business relationship in Oregon as their centers of gravity lie outside of Oregon (almost exclusively outside of the United States, in fact).

Equally fatal to Plaintiffs' argument is the absence of Oregon-based performance obligations. In *Burger King*, jurisdiction rested in large part on the defendant's acceptance of extensive, ongoing obligations requiring performance tied to the forum state. 471 U.S. at 479–82. By contrast, courts decline jurisdiction where a contract requires no performance in the forum. *E*Healthline.com*, 2022 WL 1744060, at *1; *Arce*, 2022 WL 4585825, at *8. Here, Plaintiffs do not identify any contractual provision requiring Columbia University to make payments to Oregon, submit reports to Oregon, participate in audits or inspections in Oregon, attend meetings in Oregon, litigate/arbitrate disputes in Oregon, or otherwise take action in Oregon. The absence of forum-centered performance confirms that Columbia University did not deliberately affiliate itself with Oregon in a manner that would make jurisdiction foreseeable.

Another hallmark of purposeful availment is whether the defendant invoked the forum's legal protections, such as by agreeing to forum-state governing law or dispute-resolution

---

[7] Columbia University contends the consent letters ***exclusively*** concern foreign trademark matters. But because the issue of the mistaken inclusion of the United States has not yet been adjudicated, the University uses "predominantly" to describe the fact that the first three consent letters were exclusively of foreign effect, and, other than the mistaken inclusion of the United States, the 2023 Letter Agreement was for 46 foreign countries.

13

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

provisions. *Burger King*, 471 U.S. at 482. Plaintiffs do not contend, let alone show, that the 2023 Letter Agreement requires disputes to be resolved in Oregon, except to make the implausible argument that the "agreement implicates Oregon law because it provides rights and privileges with respect to trademark laws in the United States" and thus, because "Oregon is in the United States," the laws *of the state of Oregon* are implicated. ECF No. 29 at 23 (internal quotations omitted). Plaintiffs then claim that the lawsuit's Oregon state law trademark and unfair competition claims—which it admits earlier in the brief are based on their attachment to the breach of contract and trademark claims—form a basis for jurisdiction. This is not a serious or sincere argument. The mere implication of U.S. law does not confer jurisdiction in every state, and any argument to the contrary is inconsistent with principles of fair play and substantial justice.

Finally, Plaintiffs grossly exaggerate a supposed "20-year history" between the parties, but, in any event, Plaintiffs' emphasis on the timespan of the interactions is not a substitute for the absence of Oregon-centered conduct. Indeed, timespan, by itself, does not create jurisdiction, and Plaintiffs cite no authority that states it does. *See generally* ECF No. 29. Courts in the Ninth Circuit look to the quality and nature of the defendant's forum contacts, not merely their longevity. *See Arc Wood*, 2021 WL 5771136, at *3 (no jurisdiction despite a decade long relationship where relationship was not forum-centered). A decades-long relationship that is not forum-centered does not become jurisdictionally significant through the mere passage of time. *Id.*

### C.    Plaintiffs' Case Law is Inapposite and Does Not Support Jurisdiction

Plaintiffs' reliance on *Santa Barbara Polo Club*, *American Eagle*, and *Mojis* only underscores the weakness of their jurisdictional theory. First, those cases each involved coexistence agreements of a type that are categorically and fundamentally different from the letters of consent at issue here. Each of those cases involved forum-centered, affirmative, and ongoing obligations that required performance in the forum state itself—precisely what is absent here.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Plaintiffs' suggestion that trademark "coexistence" arrangements are generally sufficient for purposeful availment, regardless of their content and terms, misreads those cases and conflicts with controlling Supreme Court and Ninth Circuit precedent. Unlike the defendants in *Santa Barbara Polo Club*, *American Eagle*, or *Mojis*, Columbia University did not agree to perform, enforce, arbitrate, comply, or otherwise act in Oregon, did not invoke Oregon law or Oregon dispute-resolution mechanisms, and did not structure its trademark conduct around Oregon-based activity.

This distinction is further evidenced in *Santa Barbara Polo Club, Inc. v. Lifestyle Licensing B.V.* in which the court found purposeful availment because the defendants affirmatively sought to enforce and benefit from a California-based coexistence agreement that required arbitration in California and ongoing performance governed by California law. No. 2:21-CV-07989-CAS (AFMX), 2024 WL 3891798, at *5 (C.D. Cal. Aug. 19, 2024). The defendants repeatedly invoked the agreement, requested assistance under it, and litigated its scope, all while availing themselves of a contractual framework expressly centered in California. *Id.* Critically, the coexistence agreement there contained a California arbitration clause requiring disputes to be resolved in Los Angeles, was expressly governed by California law, and required the parties to engage in ongoing dispute resolution and enforcement activity tied to California. *Id.* Those forum-anchored obligations were central to the court's jurisdictional analysis. The court did not, however, hold that a coexistence agreement standing alone, without these forum-centered provisions establishes purposeful availment. Rather, jurisdiction was proper because the defendants deliberately invoked California's legal protections and dispute-resolution mechanisms on a continuing basis. *Id.* Here, as noted before and by contrast, the consent letters contain no Oregon choice-of-law provision, no

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Oregon forum or arbitration clause, and no requirement of any performance—let alone enforcement—in Oregon.

*American Eagle Outfitters, Inc. v. Lyle & Scott Ltd.* is equally unhelpful to Plaintiffs. No. 2:20-CV-1488-RJC, 2021 WL 4287997 (W.D. Pa. Sept. 21, 2021). There, the defendant challenged jurisdiction in Pennsylvania after entering into a perpetual, worldwide coexistence agreement following a trademark dispute that imposed affirmative obligations governing labeling, sales channels, marketing restrictions, rights of first refusal, withdrawal of trademark oppositions in the United States, and ongoing coordination between the parties. *Id.* at *2. The court emphasized that the defendant entered into a long-term contract that regulated how products would be sold and labeled in the United States, accepted ongoing obligations affecting U.S. commerce, engaged in repeated conduct tied to enforcement and interpretation of the agreement. *Id.* at *8-10. The coexistence agreement included, among other things, a million-dollar payment, an agreement that the plaintiff would have the right of first refusal to purchase the defendant's business, an agreement that the plaintiff would pay the attorney fees of the defendant, an agreement by the plaintiff to not enter specific product markets, and to further discuss sourcing of garments. The court found Defendant's activities in Pennsylvania to address and resolve the trademark dispute resulting in the formation of the co-existence terms was sufficient to establish jurisdiction over a foreign counterparty. Those facts bear no resemblance to the limited consent letters at issue here. The University did not agree to regulate its U.S. sales, alter its labeling practices, withdraw U.S. trademark positions, or engage in ongoing coordination with Plaintiffs. Nor did it accept any affirmative duties. Plaintiffs' effort to analogize narrow, country-specific consent letters to the perpetual coexistence terms in *American Eagle* ignores the very features that made jurisdiction appropriate in that case between a U.S. company and a foreign company.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Finally, Plaintiffs' reliance on *Mojis, Inc. v. Sazerac Brands, LLC* fares no better. No. 20-CV-00777-KLM, 2021 WL 12298483 (D. Colo. Mar. 31, 2021). In *Mojis*, the court emphasized that the coexistence agreements at issue required the defendant to work with Colorado entities to correct instances of actual confusion, engage in ongoing compliance efforts, and maintain relationships with in-state distributors and promotional partners. *Id.* at *8. Those obligations were not passive or negative covenants; they were affirmative, continuing duties requiring in-forum activity and coordination with forum residents. *Id.* The court's analysis rested on the defendant's deliberate decision to structure its trademark enforcement and compliance obligations around Colorado-based entities. *Id.* Nothing comparable exists here. The consent letters do not require Columbia University to monitor confusion, correct marketplace conduct, coordinate with Oregon entities, or engage in any ongoing compliance activity in Oregon.

The trademark coexistence agreements in the cited cases are materially different from the consent letters at issue here.[8] Unlike those coexistence agreements, the consent letters are either unilateral (2006 Korea Consent, 2020 Brazil Consent) or minimally bilateral, and merely state that one party (Columbia Sportswear) will not object to a trademark registration or use in the specified jurisdictions. The consent letters at issue lack governing-law provisions, forum-selection clauses, enforcement or monitoring obligations, and ongoing compliance mechanisms.

---

[8] Generally speaking, coexistence agreements are bilateral contracts that structures how each party will operate in shared or overlapping markets on a continuing basis, with both parties assuming affirmative obligations that regulate future conduct, require ongoing compliance, and often include ongoing restrictions on use, channels, geography, branding, along with provisions concerning monitoring and correction of confusion, notice-and-cure provisions, enforcement or cooperation obligations, governing law, forum selection or arbitration clauses, and dispute-resolution mechanisms. *See* Benefits and Risks of Trademark Coexistence Agreements, Practical Law Legal Update 4-540-5507

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Applied here, this distinction is dispositive. Under *Burger King*, "continuing obligations" matter only where the defendant creates ongoing duties centered in the forum, and under *Walden*, jurisdiction cannot rest on the plaintiff's residence or unilateral conduct. A letter of consent, especially those limited to foreign trademark offices, is therefore even less of a basis for personal jurisdiction than the coexistence agreements cited in Plaintiffs' cases. Treating consent letters that imposed no affirmative duties as "continuing obligations" sufficient for purposeful availment would impermissibly shift the jurisdictional inquiry from the defendant's forum-directed conduct to the plaintiff's location, in direct contravention of *Walden*, *Burger King*, and binding Ninth Circuit precedent. In effect, Plaintiffs' theory would improperly collapse the purposeful-availment inquiry into a rule that any IP accommodation with a forum resident creates jurisdiction.

### D. Plaintiffs' "Course of Dealing" Argument Improperly Substitutes Plaintiff-Side Contacts for Defendant-Side Conduct

Plaintiffs argue that the Court must consider the parties' "entire course of dealing," citing *Global Commodities Trading Group, Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101 (9th Cir. 2020) but they fail to demonstrate a course of dealing to warrant a jurisdictional finding. In *Global Commodities*, the defendant "sustained a relationship with [the plaintiff] over several years and hundreds of contracts, purchasing millions of dollars of goods" and "consistently made payments on the contracts to Global in California." *Id.* at 1108. Further, when difficulties arose concerning the at-issue contracts, the defendant "induced [the plaintiff] to continue doing business with it by acknowledging its ongoing obligations to make payments in California." *Id.* Here, Plaintiffs identify no comparable Oregon-directed conduct or acknowledgements by Columbia University. Plaintiffs instead rely on their own Oregon-based activities (*e.g.* Plaintiffs' own employees, documents, marketing operations, internal decision-making, etc.) to try to establish jurisdiction over Columbia University—a recurring argument in Plaintiffs' Response that is

18
DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

foreclosed by *Walden*. *See* 571 U.S. at 285. The fact that Plaintiffs chose to base their trademark operations in Oregon does not convert Columbia University's out-of-state conduct into Oregon-directed activity. Jurisdiction is not created by Plaintiffs' unilateral decision about where to locate its business.

Plaintiffs rely on *Silk v. Bond* for the claim that "a decades-long business relationship with a California-based service provider **clearly** constitutes purposeful availment of the privilege of doing business in California" (*see* ECF No. 29 at 18), but there is no comparable business relationship between the Parties here.[9] Plaintiffs also fail to adequately address *Davis v. Cranfield*, also a Ninth Circuit case that followed *Silk*, that Plaintiffs cited in their Response. *Id.* at 18, 20, 22 (citing 71 F.4th 1154 (9th Cir. 2023)). *Davis* found that none of the defendant's "actual course of dealings in [the forum state] was so substantial or widespread that it reflects [the defendant's] attempt to gain the 'benefits and protections' of the forum state." 71 F.4th at 1166. In *Davis*, the Ninth Circuit expressly discussed its "recent decision in *Silk v. Bond*," which the Court said "illustrates the level of substantial connections under a contractual relationship that may suffice." *Id.* at 1165. The Ninth Circuit in *Davis* further explained that in *Silk*, "the defendant sought out a contractual relationship in the forum state that *would require all related work to take place in that state*." (emphasis added). *Id.* at 1165-66. That is not remotely similar to this case.

Further, in *Silk*, the "contract referenced the forum state and the defendant paid into forum-state bank accounts, mailed paper copies of relevant documents to the forum state each month for two decades, and at times sent family members to the forum state for contract-related meetings on his behalf." *Id.* at 1166. Again, nothing remotely similar to this case, as "Oregon" was not

---

[9] The material differences between *Silk* and the present case are further described in section IV, *infra*.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

mentioned in any of the four consent letters. Like the Ninth Circuit found in *Davis*, Columbia University's interactions with Oregon "are far more random, fortuitous, and attenuated," making this case more analogous to *Davis* and *Picot* than *Silk. Id.*

### III.  Plaintiffs Fail To Establish Purposeful Direction

Plaintiffs' purposeful direction arguments are based on: (1) Columbia University's webstore, owned and operated by Barnes & Noble, which offers the Accused Products for sale nationwide by virtue of being on the internet, (2) generalized, speculative allegations of sales to alumni, high school students, their parents, and their "well-wishers" and (3) three articles of allegedly infringing merchandise which were purchased and shipped to Oregon in October 2025 after Plaintiffs learned Columbia University was challenging personal jurisdiction. ECF No. 21 ¶¶ 17-20. None of these is sufficient to constitute purposeful availment, and Plaintiffs' arguments fail under a proper application of the *Calder* framework.

### A.    Plaintiffs' Response Misstates Columbia University's Arguments.

Plaintiffs' Response mischaracterizes Columbia University's arguments. For example, Plaintiffs present the strawman that Columbia University is promoting a "small percentage of sales exception" theory but, as explained below, Columbia University does nothing of the sort. Plaintiffs' Response also misinterprets the import of Columbia University's online sales and in-store sales figures, and, in so doing, misleadingly conflates the key distinction of Columbia-branded products with what is actually at issue in the purposeful direction analysis (i.e. Accused Products sold into Oregon).

Equally inaccurate is Plaintiffs claim the Court "must" accept as true their supposedly "uncontroverted" allegation that Columbia University "readily sells" the Accused Products to its

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

alumni in Oregon.[10] But the Court need not do so, because Plaintiffs' allegations concerning alumni have been controverted. *See e.g.* ECF No. 25 at 8 ("the University does not sell merchandise, including, but not limited to the Accused Products, through or in connection with any Oregon alumni groups, despite Plaintiffs' baseless claim to the contrary") (citing ECF No. 25-1, ¶ 12) and at 26 ("contrary to Plaintiffs' baseless suggestions, Columbia did not offer for sale or sell merchandise in connection with high school visits or alumni events in Oregon.") (citing Fishman Declaration, ECF No. 25-1, ¶ 10).

Plaintiffs also incorrectly declare that "it makes no difference who made the specific purchases confirming Columbia University's capacity and willingness" to have Accused Products available for purchase on a website accessible by an Oregon resident. ECF No. 29 at 25. That is merely Plaintiffs way of saying that their own purchase of Accused Products after learning Columbia University was challenging jurisdiction should be sufficient for purposeful direction. But it is not. Indeed, "capacity and willingness" in this context is nothing more than yet another futile repackaging of the unfavorable and legally defective notion that a website capable of selling products nationwide confers personal jurisdiction. In any event, *Herbal Brands* expressly stated that "[d]epending on the particular facts of a future case, jurisdiction might not exist if a plaintiff purchased a product solely in an attempt to manufacture jurisdiction." 72 F.4th at 1097.

---

[10] With its "readily sells" language, Plaintiffs appear to repackage the rejected argument that any entity with a website that can ship to Oregon is subject to jurisdiction in Oregon, but *Herbal Brands* reaffirmed that "operation of an interactive website does not, by itself, establish express aiming" and warned that treating website accessibility as dispositive would "subject[] [a seller] to specific jurisdiction in every forum in which the website was visible," a result "too broad to comport with due process." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023).

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

**B.    *Herbal Brands* focuses on whether sales into a forum made in the ordinary course of business or are random, isolated, or fortuitous.**

*Herbal Brands* highlights *the absence* of the defendant-focused, forum-directed conduct in this case that due process requires and underscores why jurisdiction is lacking here. The pivotal point of *Herbal Brands* is that in analyzing the "express aiming" element of the *Calder* effects test, purposeful direction is proper only where sales into the forum "occur as part of the defendant's regular course of business instead of being random, isolated, or fortuitous"—in other words, distinguishing between an "isolated sale and a genuine attempt to serve the market." 72 F.4th at 1094, 95. The Ninth Circuit further provided guidance on "whether a sale occurs in a defendant's regular course of business," stating that "is a case-specific question that may turn on factors such as" the following: "the seller's identity (individual or a business entity), the nature of the website used, the defendant's total volume of online sales including sales outside the forum, the number or variety of products offered on the defendant's website, and the defendant's online advertising." *Id.* at 1094.

The information provided by Columbia University and not refuted by Plaintiffs support a finding that any suspected sales to Oregon citizens did not occur as part of its regular course of business. Further, nothing in *Herbal Brands* supports Plaintiffs' attempt to ground jurisdiction whether given the presence of alumni or their presumed purchasing behavior or for other reasons. The Ninth Circuit reiterated that jurisdiction must arise from the defendant's own contacts with the forum, not the unilateral decisions or residence of third parties. *Id.* Treating alumni residence as a basis for jurisdiction would subject universities to suit nationwide wherever graduates happen to live—an outcome incompatible with *Walden* and not endorsed in *Herbal Brands*.

22
DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

### C. Plaintiffs' Cannot Establish Any Sales Into Oregon Occurred As Part Of Columbia University's Ordinary Course of Business

As stated in its opening brief and herein, based on the best available information in its possession, Columbia University believes the volume of Accused Products sold into Oregon is likely *zero*, and explained the basis for its belief in its opening brief, and again below, supporting Columbia University's position that in the highly unlikely event that an Accused Product was sold into Oregon, it would have been outside the ordinary course of Columbia University's "business."

Columbia University's merchandising footprint, operations, and volume are nothing like that of Plaintiffs' who had net sales of approximately $3.4 billion in net sales in 2024 all across the globe.[11] The overwhelming majority of Columbia University's merchandise is sold at its Barnes & Noble campus store (in New York). For example, in FY 2025, online sales comprised roughly 10% of total Barnes & Nobles sales of Columbia-branded products, whereas the remaining sales occurred at the campus store. *See* ECF No. 25-2, ¶ 11. To be clear, those approximately 10% of online sales concern *all* merchandise (not just Accused Products) and includes online sales to students and alumni in New York and elsewhere.

In other words, given the tiny number of potential customers in Oregon, and the small number of online sales across the globe, sales of *any* Columbia University merchandise is likely to be exceedingly low, if not zero. That only becomes more infinitesimal when it is understood, crucially, that the Accused Products—which are the relevant products for the purposeful direction analysis—made up just 0.05% of all Columbia-branded products sold over FY 2023-2025, and just 0.03% of the dollar volume over that time period.[12] Thus, it is a fact that the number of Accused

---

[11] https://investor.columbia.com/news-events/press-releases/detail/369/columbia-sportswear-company-reports-fourth-quarter-and-full

[12] Not 5%, nor 0.5%. It was **.05 percent** and **.03 percent**, respectively.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Products sold *anywhere* was exceedingly low—even in Columbia University's New York location. Combining that fact, then, with the fact that only 10.9% of the Columbia-branded products were sold via the Barnes & Noble Webstore (as opposed to 89.1% at the Barnes & Noble Campus Store) online, and that those online sales included sales to New York and elsewhere in the Northeast, it is reasonable to infer that effectively no Accused Products were sold into Oregon, and/or that to the extent any sales into Oregon somehow did occur, they would be random, isolated, and/or fortuitous. The information provided in the Fishman and Elliot Declarations makes clear that the number of Accused Products sold in Oregon is likely zero, and, in any event, outside the course of Columbia University's business. *See* ECF Nos. 25-1, 25-2. This certainly rebuts the allegation that Columbia University "readily sells" infringing goods to alumni and others in Oregon, and refutes Plaintiffs' unsubstantiated accusation that Columbia University "downplayed" its sales figures. *See Tr. of Summers Fam. Tr. TA Neak Prods. Buff WA Pty, Ltd. v. Nat'l Distribution Warehouse, Inc.*, No. 2:20-CV-10741-CAS-EX, 2021 WL 2354507, at *8 (C.D. Cal. June 7, 2021) (bare assertion of sales rebutted by declaration stating no sales occurred).

As noted, *Herbal Brands* requires a case-specific analysis to determine whether the alleged sales occurred as part of the defendant's regular course of business.[13] 72 F.4th at 1094. Courts have rejected attempts to frame the inquiry broadly. Accordingly, the question is not whether the defendant is in the business of selling products, but whether the defendant is in the business of selling products *into the forum*. *See Prolacta Bioscience, Inc. v. Prolact Ltd.*, No. 2:24-CV-10392-WLH (E), 2025 WL 2078270, at *10 n.15 (C.D. Cal. June 18, 2025) ("The Court rejects Plaintiff's

---

[13] Unlike Columbia University has done in this case, in *Herbal Brands* the Ninth Circuit specifically noted that in that case, the defendants "[did] not contend that the alleged sales to Arizona residents occurred outside of their regular course of business," and thus the Court left "the precise contours of that inquiry for another day." 72 F.4th at 1094.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

contention that the question is not whether 'selling products *into the forum* is part of the defendant's regular course of business but whether *selling products* is part of the defendant's regular course of business. . . .' This contention appears incompatible with the plain language of *Herbal Brands* . . . .") (emphasis in original).

It bears reiterating that while Columbia University has used "Columbia" in connection with apparel for over a century, Columbia University's predominant mission is providing world-class educational and research services. Columbia University is not a commercial e-commerce seller whose sole business model is to sell consumer goods nationwide. Its campus store exists primarily to serve students and faculty in connection with its provision of educational services.

Plaintiffs claim that Columbia University "presumably has access to its own or its representative's sales records, but has not submitted evidence to show that it has not sold these products into Oregon at all." ECF No. 29 at 26-27. Plaintiffs' presumption is wrong. As explained in Columbia University's Opening Brief and its supporting declarations from Columbia employees, "Columbia-branded merchandise [] is sold predominantly through the on-campus Barnes & Noble bookstore in New York," which, along with "the corresponding webstore [] are operated by Barnes & Noble, not Columbia University." ECF No. 25-2, ¶ 6. As further stated, the University "does not control the website's functionality, payment process, order fulfillment, or shipping." *Id.* Without having the payment and shipping records to more definitively state that Columbia University has never sold an Accused Product into Oregon, Columbia University provided the best available information in its possession to show how remote the possibility was of any Accused Products being sold into Oregon via web-sales (*i.e.* outside the ordinary course of the University's business). Accordingly, Columbia University's ordinary course of business does

25
DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

not involve selling products—accused or otherwise—to Oregon and Plaintiffs' generic allegations of sales to Oregon have been refuted. Thus, such assertions cannot confer specific jurisdiction.

**D.    Alumni Presence and Website Accessibility Do Not Establish Express Aiming**

Plaintiffs assert that the Court must accept as true its allegations that Columbia University readily sells infringing goods to Columbia University alumni and others residing in Oregon. *See* ECF No. 29 at 25. Not so. First, as set forth in Columbia University's opening brief and supporting declaration, Columbia University "did not offer for sale or sell merchandise in connection with high school visits or alumni events in Oregon." ECF No. 25 at 32 (citing ECF No. 25-1, ¶ 10). This rebuts any allegations regarding sales at alumni events such that the Court need not accept Plaintiffs allegation as true. *See In Re Kia Hyundai Vehicle Theft*, No. 8:22-ML-03052-JVS (KESX), 2024 WL 3469044, at *4 (C.D. Cal. July 5, 2024) (allegations that defendant maintained an R&D facility in CA and employed thousands was contradicted by declaration stating that Defendant did not maintain a sales force, CA, was not registered to do business, did not pay taxes to CA, and designed its products in Korea).

Moreover, as previously explained, the presence of alumni in Oregon reflects the unilateral choices of third parties, not forum-directed conduct by Columbia University. Treating alumni or prospective student residence as a jurisdictional contact would subject universities, nonprofits, and membership organizations to nationwide jurisdiction wherever their alumni or members happen to live, which would be inconsistent with due process under the Constitution. Further, Plaintiffs' statement that "it makes no difference who made the specific purchases confirming the University's capacity and willingness to do so" ignores the fact that sales made by or at the direction of Plaintiffs are not made in the ordinary course of business and therefore cannot show any capacity or willingness on the part of Columbia University. *See* section III(E), *infra*.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

### E.    Plaintiffs Cannot Manufacture Jurisdiction Through Post-Dispute Purchases

With the generic allegations refuted, Plaintiffs are left with their jurisdictional allegations resting solely on the alleged October 2025 sales, which were quite apparently purchases made by Plaintiffs to manufacture jurisdiction. Courts consistently reject such litigation-driven transactions as a basis for personal jurisdiction. Plaintiffs coyly respond that "nothing in Columbia Sportswear's pleadings or in the declarations submitted by the University indicates that to be the case" but do not deny that these were in fact purchased by Plaintiffs or their representatives to manufacture jurisdiction. *See* ECF No. 29 at 29.

Plaintiffs further argue that, even if the October 2025 sales were purchased by counsel, such sales may be used to establish jurisdiction because it was only "some district courts ***prior to Herbal Brands*** [that] have discounted sales as reflecting an attempt to manufacture jurisdiction." *Id.* (emphasis added). Plaintiffs fail to mention that <u>*Herbal Brands* itself</u> stated that "[d]epending on the particular facts of a future case, jurisdiction might not exist if a plaintiff purchased a product solely in an attempt to manufacture jurisdiction." 72 F.4th at 1097. And, in fact, courts <u>post</u>-*Herbal Brands* continue to find sales made to manufacture jurisdiction insufficient because, among other reasons, they are not sales in the ordinary course of business. *See Prolacta*, 2025 WL 2078270, at *10 (finding sales to private investigators did not occur in the regular course of business); *Domaine Carneros, Ltd. v. Lea Trading LLC*, No. 24-CV-01834-BLF, 2024 WL 4197633, at *5 (N.D. Cal. Sept. 12, 2024) ("District courts in this circuit have declined to find the express aiming element of *Calder* met based on products purchased at the plaintiff's direction."); *Mazal Grp. LLC v. Yousef*, No. 2:23-CV-03278-FWS-AGR, 2023 WL 8896263, at *5 (C.D. Cal. Nov. 8, 2023) (finding sale of nine units into California insufficient to satisfy express aiming requirement where the units were purchased at the plaintiff's direction).

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Ironically, Plaintiffs' citations of out-of-circuit law and district court cases are each "prior to *Herbal Brands,*" and, in fact, are cases discussed in *Herbal Brands* itself, and, thus, unavailing.[14] *See* ECF No. 29 at 29-30. With respect to the in-circuit cases, the Court in *Vicious Brands, Inc. v. Face Co., LLC* did not find the sale to counsel alone sufficient, but instead found the sale to counsel, coupled with a "not-insignificant number of sales to the state as a whole . . . and the lack of evidence or argument that such sales excluded [the] district" sufficient to support specific jurisdiction. No. 24-CV-04996-LJC, 2024 WL 4753287, at *11 (N.D. Cal. Nov. 12, 2024). Here, as discussed above, there are near zero or zero sales of the Accused Products to Oregon, so the reasoning of *Vicious Brands* is simply inapplicable. The other in-circuit case, *Stomp, Inc. v. NeatO, LLC*, concluded that the sales to the plaintiff's president and a friend of his, in combination with an interactive website, was sufficient to confer jurisdiction. 61 F. Supp. 2d 1074, 1078 (C.D. Cal. 1999). But that case has subsequently been criticized as taking an overly expansive view of specific jurisdiction. *See Boschetto*, 539 F.3d at 1022 n.1 (9th Cir. 2008) (Rymer, J., concurring) ("Although Boschetto points to *Stomp, Inc. v. NeatO, LLC*, 61 F.Supp.2d 1074, 1077 (C.D.Cal.1999), I do not accept its suggestion that conducting any business over the Internet subjects a defendant to suit nationwide."). Thus, neither case countermands the bulk of authority

---

[14] *NBA Props., Inc. v. HANWJH*, 46 F.4th 614 (7th Cir. 2022) and *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) are non-binding authority. The Seventh Circuit's holding in *NBA Properties* would be inconsistent with the Ninth Circuit's requirement in *Herbal Brands* that the sales occur as part of the defendants' regular course of business. *See Prolacta*, 2025 WL 2078270, at *10. And despite Plaintiffs' citation, *Chloe* did not hold that a "single item shipped to assistant at Plaintiff's law firm supported personal jurisdiction." ECF No. 29 at 29. Rather, the Second Circuit expressly declined to decide the issue and instead found jurisdiction was proper based on the item's shipment in combination with other business activities. *Chloe*, 616 F.3d at 165 n.3. Thus, both out-of-circuit cases cited by Plaintiffs are either inconsistent with Ninth Circuit law or inapplicable.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

finding attempts to manufacture jurisdiction improper, and the October 2025 sales cannot support jurisdiction over the University in Oregon.

### F.    Conclusion Regarding Purposeful Direction

When Plaintiffs' allegations are stripped of plaintiff-side contacts and litigation-driven transactions, nothing remains to establish express aiming at Oregon. Plaintiffs identify no Oregon-specific advertising, no Oregon-directed distribution strategy, and no deliberate effort by Columbia University to exploit the Oregon market. Under *Calder*, *Walden*, *Axiom Foods*, and *Herbal Brands*, Plaintiffs' arguments clearly fail. Columbia University did not expressly aim alleged infringing conduct at Oregon, and Plaintiffs' tort-based claims therefore cannot support personal jurisdiction.

## IV.  Plaintiffs Fail To Show That Their Claims "Arise Out Of Or Relate To" Any Oregon-Directed Conduct

Even if Plaintiffs could establish purposeful availment or purposeful direction—which they cannot—their claims still fail because Plaintiffs do not satisfy the second prong of the specific-jurisdiction analysis, which requires the claims "arise out of or relate to" the defendant's forum-related activities. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

In discussing the specific personal jurisdiction standard, Plaintiffs' Response quotes *Davis* for the notion that "the claims at bar [must] arise out of or relate to the defendant's contacts with the forum" ECF No. 29 at 18. Notably, *Davis* is a case which found the plaintiff had "fail[ed] to establish that [the defendant] had sufficient minimum contacts with Idaho" and thus the Ninth Circuit "decline[d] to proceed to the remaining two prongs of the specific jurisdiction test." 71 F.4th at 1166. Yet, later in Plaintiffs' Response, in contending the basis for the second purposeful availment prong is the four consent letters addressed above, and attempting to explain its position

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

on what "[a]rise out of or relate to" means, Plaintiffs cite to *Silk*, and ignore *Davis'*s clarification regarding what *Silk* did and did not hold. ECF No. 29 at 24-25.

Nevertheless, Plaintiffs' citation to *Silk* does them no favors either, as it highlights the material differences between this case and that one. In *Silk*, the plaintiff, Roger Silk, "[f]or more than two decades . . . provided tax-and-estate planning services to Frank Bond," who "had approximately $40 million in liquid assets at the time he retained Silk." *Silk v. Bond*, 65 F.4th 445, 448 (9th Cir. 2023). For approximately five years, "Silk worked ***exclusively*** for Bond." *Id.* at 449 (emphasis added). Over the decades, Silk and Bond entered several agreements relating to financial services provided by Silk for Bond, in exchange for fees, which included an "incentive fee [that] would only become payable upon Bond's death." *Id.* at 449 (internal quotation marks omitted). After Bond died, "Silk filed a $3.1 million claim against the Estate." *Id.* In response, the Estate moved to dismiss, including for lack of personal jurisdiction. *Id.* The Ninth Circuit found that Bond had "established purposeful contact with California via his contracts with Silk . . . for services," and that "Bond created a multi-year business relationship that envisioned continuing and wide-reaching contacts with Silk in California." *Id.* at 457. Under the facts of that case, the Ninth Circuit found that "by contracting with Silk, Bond created 'continuing obligations' to Silk" and that "[c]laims arising out of the alleged breach of those contracts therefore arise out of forum-based activities." *Id.* The Court clarified that it was reasonable for California courts to exercise specific jurisdiction over the Estate "given Bond's retention of a California-based financial advisor who performed all the contracted-for services from California." *Id.* The facts of *Silk* are dramatically different than those at issue here, including, crucially, that unlike in *Silk*, in which the plaintiff and defendant were engaged in a significant business relationship that included ***exclusive*** work for a half-decade, here, Plaintiffs performed no service of any kind to Columbia University, or vice

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

versa. Rather, Plaintiffs simply provided their consent to trademark use and registration in certain territories in a few consent letters over the span of 20 years. There was no "relationship" beyond that, and thus the claims do not arise out of or relate to any University activity in Oregon.

Here, Plaintiffs identify no comparable Oregon-directed conduct by Columbia University. Plaintiffs' claims arise from decisions and conduct that occurred outside Oregon, including decisions concerning trademark usage made in New York, merchandise design and approval processes conducted outside Oregon, and sales overwhelmingly occurring on campus in New York or through non-Oregon-centered channels. The alleged injury Plaintiffs claim to have suffered in Oregon flows from their own business location, not from Oregon-directed conduct by Columbia University. Under *Walden*, that is insufficient. 571 U.S. at 290 ("mere injury to a forum resident is not a sufficient connection to the forum"). Columbia University does not systematically serve the Oregon market for the allegedly infringing products. It does not advertise them in Oregon, does not operate Oregon-focused distribution channels, and does not maintain Oregon-based retail or service infrastructure. Any Oregon sales, if any even exist beyond the ones from October 2025 that likely made on behalf of Plaintiffs to manufacture jurisdiction, would be incidental.

## V.   If The Court Declines To Dismiss, Transfer To New York Is Warranted

If the Court determines that dismissal is not appropriate, it should transfer this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

The operative facts are largely unrelated to Oregon, and Oregon has little interest in the case beyond Plaintiffs being located there. As to Plaintiffs' choice of forum, it either weighs weakly against transfer or is neutral. Plaintiffs rely on: (1) Oregon's alleged interest in protecting commercial business interests in Oregon and (2) Plaintiffs' residency in the state of Oregon. *See* ECF No. 29 at 33-34. But, as explained above, the contractual claims are based on a contract that is largely or exclusively of foreign effect and which does not specifically relate to Oregon beyond

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Oregon being part of the United States and Plaintiffs being located there. *See* section I(A), *supra*. Accordingly, Oregon's interest in the case is tenuous at best. *See Moretti v. Hertz Corp.*, No. C 13-02972 JSW, 2014 WL 1410432, at *5 (N.D. Cal. Apr. 11, 2014) (local interest did not favor litigating in forum despite the plaintiff being a forum resident where there was no proof the at-issue conduct took place in the forum). Additionally, the mere fact that Plaintiffs reside in Oregon is insufficient to prevent transfer where other forums also share an interest in the claims. *See id.* (granting transfer despite forum resident plaintiff). Accordingly, because the operative facts are largely unrelated to Oregon and its interest is limited to Plaintiffs' residence in Oregon, the local interest factor either weighs weakly against transfer or is neutral.

Because Plaintiffs are located in Oregon, Plaintiffs argue the convenience of the parties, convenience of the witnesses, and the ease of access to sources of proof weigh against transfer and that litigating in New York would shift the financial burden to Plaintiffs. But Plaintiffs' assertion ignores the asymmetry inherent in their claims. *See* ECF No. 29 at 34-35. Plaintiffs' headquarters (and therefore documents/witnesses) may be located in Oregon, but Columbia University's witnesses and any documents are in New York. *See* ECF No. 25 at 40-41 (explaining that the University's main campuses, employees (including trademark and licensing personnel), and witnesses are in New York, and that the University is not aware of any of its witnesses or documents related to the Accused Products located in Oregon). And it is New York—and not Oregon—which will have the "bulk of the relevant evidence" because Columbia University is the accused infringer. *See Wheel Pros, LLC v. Performance Tire*, No. CV170042PSGAJWX, 2017 WL 6017292, at *10 (C.D. Cal. Apr. 24, 2017) ("In a trademark infringement case, the bulk of the relevant evidence usually comes from the accused infringer, and as a result, the place where the defendant's documents are kept weighs in favor of transfer to that location.") (internal quotation

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

marks omitted). The issue of Columbia University's sales, trademark rights, and activities that may be within the scope of discovery intended by Plaintiffs all involve New York-based witnesses and documents, refuting Plaintiffs' convenience claims.

Accordingly, the expense of litigating in New York—where the bulk of the relevant documents and witnesses are located—will result in significantly decreased litigation costs than litigating in Oregon. Moreover, contrary to Plaintiffs' assertions, modern advances in technology do not render this factor irrelevant. *RecogniCorp, LLC v. Nintendo Co.*, No. 3:11-CV-01532-ST, 2012 WL 4739538, at *4 (D. Or. Oct. 3, 2012) ("[T]he fact 'that access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous.'") (quoting *In re TS Tech USA Corp.*, 551 F.3d 1315, 1321 (Fed. Cir. 2008)).

## VI.    Conclusion

As set forth herein and in Columbia University's motion to dismiss (ECF No. 25), Plaintiffs' claims should be dismissed for lack of personal jurisdiction or, in the alternative, the case should be transferred to the United States District Court for the Southern District of New York.

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

Dated: January 15, 2026                    Respectfully submitted,

                                              Andrea R. Meyer
**SUSSMAN SHANK LLP**
1000 SW Broadway, Suite 1400
Portland, OR 97205
P: (503) 227-1111
F: (503) 248-0130
ameyer@sussmanshank.com

Sartouk H. Moussavi (*pro hac vice*)
**THOMPSON COBURN LLP**
55 East Monroe Street, 37th Floor
Chicago, IL 60603
P: (312) 346-7500; F: (312) 580-2201
smoussavi@thompsoncoburn.com

Zachary G. Newman (*pro hac vice*)
**THOMPSON COBURN LLP**
488 Madison Avenue
New York, NY 10022
P: 212 474 7200
F: 212 478 7400
znewman@thompsoncoburn.com

*Attorneys For Defendant*

34
DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), and 54-3(e) because it contains approximately 10,111 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on January 15, 2026.

*/s/ Andrea R. Meyer*

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (OR TRANSFER)